878 P.2d 948 (1994)
Jo Ann ALLISON, Individually, and Jo Ann Allison, as Natural Parent and Guardian of Thomas Allison, Appellant,
v.
MERCK AND COMPANY, INC., a New Jersey Corporation, and Clark County Health District, Respondents.
No. 19888.
Supreme Court of Nevada.
July 26, 1994.
*951 Goodman & Chesnoff, Las Vegas, Richard R. Shreves, Austin, TX, for appellant.
Beckley, Singleton, DeLanoy, Jemison & List, Las Vegas, Preuss, Walker & Shanager, San Francisco, CA, for respondent Merck and Company, Inc.
Barker, Gillock, Koning, Brown & Earley, Las Vegas, for respondent Clark County Health District.

OPINION
SPRINGER, Justice:
The trial court entered summary judgment against appellant Jo Ann Allison and her son Thomas, who are suing the Merck pharmaceutical company ("Merck") and the Clark County Health District ("Health District") because they claim that a Merck-manufactured measles, mumps and rubella vaccine (the MMR II) administered by the Health District caused then seventeen-month-old Thomas to contract encephalitis and to suffer from consequent blindness, deafness, mental retardation and spastic contractures.[1] We conclude that Merck may be liable to Thomas Allison by reason of its *952 strict liability as manufacturer if Thomas can prove that the vaccine in question is the cause of his disabilities.[2] In addition, we conclude that Merck may be liable to Thomas and Ms. Allison for failing to provide a proper warning regarding the vaccine. Accordingly, we reverse the summary judgment in favor of Merck and remand to the trial court for a trial on Thomas' strict liability claim and on Thomas' and Ms. Allison's failure-to-warn claims.[3]

STRICT LIABILITY
To establish liability under a strict tort liability theory, Thomas must establish that his injury "was caused by a defect in the product, and that such defect existed when the product left the hands of the defendant." Shoshone Coca-Cola Co. v. Dolinski, 82 Nev. 439, 443, 420 P.2d 855, 858 (1966). In this case, whether any defect in the vaccine that might have caused Thomas's disabilities was present "when the product left the hands of the defendant[s]" is not a matter of controversy; so, if the Allisons can prove that Thomas' encephalitis "was caused by a defect in the product," then plaintiffs should be able to recover from Merck.
We have already considered the meaning of the word "defect" in connection with strict products liability. In Ginnis v. Mapes Hotel Corp., we adopted a definition of "defect" that is still useful and applicable to the case at hand: "`Although the definitions of the term "defect" in the context of products liability law use varying language, all of them rest upon the common premise that those products are defective which are dangerous because they fail to perform in the manner reasonably to be expected in light of their nature and intended function.'" 86 Nev. 408, 413, 470 P.2d 135, 138 (1970) (quoting Dunham v. Vaughn & Bushnell Mfg. Co., 42 Ill.2d 339, 247 N.E.2d 401, 403 (1969)). If Thomas can establish that the vaccine caused him to suffer permanent brain damage, then surely the vaccine failed to perform in the manner reasonably to be expected "in light of [its] nature and intended function." The nature and intended function of this vaccine, of course, is to create an immunity to measles, mumps and rubella without attendant blindness, deafness, mental retardation and permanent brain damage.[4]
Under the law of strict liability in this state, responsibility for injuries caused by defective products is properly fixed wherever it will most effectively reduce the hazards to life and health inherent in defective products that reach the market. Although manufacturers are not insurers of their products, where injury is caused by a defective product, responsibility is placed upon the manufacturer and the distributor of the defective product rather than on the injured consumer. See Stackiewicz v. Nissan Motor Corp., 100 Nev. 443, 448, 686 P.2d 925, 928 (1984); see also Nat'l Union Fire Ins. v. Pratt and Whitney, 107 Nev. 535, 815 P.2d 601 (1991).
In Stackiewicz, we allowed a strict liability case to go to the jury on the plaintiff's claim of an idiopathic steering defect in an automobile which the plaintiff claimed was the cause of her injuries. We said in Stackiewicz that when "`machinery "malfunctions," it obviously lacks fitness regardless of the cause of the malfunction.'" Id. at 448-49, 686 P.2d at 928 (quoting Lindsay v. McDonnell Douglas Aircraft Corp., 460 F.2d 631, 639 (8th Cir.1972)). In the case before us, plaintiffs are claiming in effect that the vaccine "malfunctioned"; and, if we are to follow Stackiewicz, then a vaccine which causes permanent brain damage "obviously lacks fitness regardless of the cause of the malfunction."[5] If the vaccine is found by a *953 factfinder to have caused Thomas to develop the disabling encephalitis, then Merck's "`"sin" is the lack of fitness as evidenced by the malfunction itself rather than some specific dereliction by the manufacturer.'" Id. 100 Nev. at 449, 686 P.2d at 928 (quoting Lindsay, 460 F.2d at 639).
Unless we are going to abandon long-standing public policy grounds for holding manufacturers and distributors of defective products responsible for injuries caused by manufactured products that prove to be defective, Thomas must be given an opportunity to prove that a malfunctioning vaccine caused his injuries, just as we allowed Ms. Stackiewicz to try to prove that her injuries were caused by a defective steering mechanism. The public policy considerations that support holding the defendants liable in this case (if plaintiffs can prove that the vaccine caused his injuries) were put well by Professor Prosser in the noted law review article, "The Fall of the Citadel":
The public interest in human safety requires the maximum possible protection for the user of the product, and those best able to afford it are the suppliers of the chattel. By placing their goods upon the market, the suppliers represent to the public that they are suitable and safe for use; and by packaging, advertising and otherwise, they do everything they can to induce that belief....
50 Minn.L.Rev. 791, 799 (1966). This concept of "public interest" is the guiding principle of our present opinion.
If we are going to follow Shoshone Coca-Cola and Stackiewicz, we must send this case back to the trial court. A vaccine that causes blindness and deafness is a defective product. Causation is a factor yet to be determined by a factfinder.[6]

"UNAVOIDABLY UNSAFE"?
Merck claims that it is free from strict manufacturer's liability by virtue of the dictum stated in comment k to section 402A of the Restatement (Second) of Torts.[7] This *954 comment suggests that a drug manufacturer should not be held liable for "the unfortunate consequences attending" the use of its drugs if: (1) the manufacturer supplies "the public with an apparently useful and desirable product, attended by a known but apparently reasonable risk," (2) the drug is "properly prepared and marketed," and (3) "proper warning is given."
It is not easy to divine just why the framers of the comment thought that a drug manufacturer should be excused in cases in which it manufactured a drug that was "known" to be dangerous. The whole idea behind strict tort liability is that the manufacturer, not the consumer, should bear the responsibility for injuries, even when the product is ostensibly properly prepared and marketed and when the plaintiff is not in a position to prove the origin of the defect.[8]See Stackiewicz, 100 Nev. at 443, 686 P.2d at 925.
What the question in this case really gets down to is whether an exception should be made in a case in which a drug manufacturer injures a consumer with a drug that it knows is dangerous, but not too ("unreasonably") dangerous. That is to say, should a drug manufacturer be allowed to profit with impunity from the distribution of a drug that it knows is capable of resulting in physical injury, so long as the drug can somehow be certified as not being unreasonably dangerous? We answer that question in the negative and say that a drug manufacturer should, under the strict liability jurisprudence of this state, be held liable in tort even when the drug is "properly prepared and marketed" (that is to say, non-negligently) and even when the known danger inherent in the drug may be what the comment calls "reasonable."
The apparent rationale of comment k in relieving drug manufacturers from liability is that where the manufacturer is free from fault, that is to say it produces a product that is unsafe because of a claim by the manufacturer that it is "incapable of being made safe," the manufacturer should not be responsible for injuries resulting from use of the drug. The comment itself gives as an example of such an "unavoidably unsafe" drug the Pasteur treatment of rabies "which not uncommonly leads to very serious and damaging consequences when it is injected." We would note, however, that the reason why serious and damaging consequences of the Pasteur rabies treatment do not result in tort liability is not because of the "unreasonably dangerous" doctrine proposed by comment k, but, rather, because the victim chooses to be injected with a drug having known "damaging consequences" rather than to die from rabies. It is the voluntary choice to take the antirabies serum that eliminates tort liability and not the serum's being said to be unavoidably or reasonably dangerous. There is no need to make an exception to the rules of strict liability such as that suggested by comment k in the rabies example because the rabies victim waives tort claims by accepting what the victim knows to be the necessary risk involved in the treatment.[9]
*955 Speaking of "unavoidable" danger or fault-free infliction of harm, or speaking of reasonable (and therefore acceptable) risk of harm, is very much alien to strict liability theory and should have no place in the Restatement provisions relating to strict liability. Mixing concepts of fault-free ("unavoidable") manufacture and "reasonable risk" into the context of non-negligent, strict liability is entirely inconsistent with our products liability cases and with the law established in this state for almost thirty years. The well-accepted principle supporting our products liability cases is expressed in comment c of section 402 A of the Restatement:
[P]ublic policy demands that the burden of accidental injuries caused by products intended for consumption be placed upon those who market them, and be treated as a cost of production against which liability insurance can be obtained; and that the consumer of such products is entitled to the maximum of protection at the hands of someone, and the proper persons to afford it are those who market the products.
It could not be said any more clearly than this. Merck, not Thomas Allison, must, if the Merck product did in fact cause Thomas' overwhelming misfortune, bear the "burden of the accidental [intended] injuries caused by products intended for consumption." Restatement (Second) of Torts, § 402 A, cmt. c (1965).
The Dissent and Merck urge that the imposition of liability on Merck for Thomas' injuries in this case would act as a deterrent to necessary and beneficial research and development of new drugs. The Dissent and Merck appear to be arguing that if Merck were to be held liable for statistically infrequent injuries such as the one at bar, society would be the worse because Merck and other drug manufacturers would be fearful and retarded in the development of new and greatly needed immunological products. If Merck were to have to pay for what its vaccine has done to Thomas, this would, Merck says, necessarily inhibit the development and marketing of immunological products which are helpful to many and "unfortunately" devastating to others.
Although, on policy grounds, Merck might talk some legislative body into immunizing it from liability, it would be certainly inappropriate for the court to make such a radical change in our well-established products liability law. Further, one would think that if a legislature were going to give such special benefits to drug manufacturers, most certainly the resultant legislation, to be just, would have to afford some kind of compensation or relief to the victims of "unavoidably unsafe" drugs. If, for example, a legislature provided that automobile manufacturers would be held to a standard of strict liability for manufacturing defects, even if injuries caused by a given defect are statistically infrequent and perhaps "unavoidable," and at the same time immunized drug manufacturers from liability for injuries caused by their vaccines, the legislature would, as mentioned, very probably and properly include in such discriminatory legislation some kind of no-fault victim compensation plan to set off the advantage given to drug manufacturers over other kinds of manufacturers.[10]
*956 In summary, this court cannot, under our law, read comment k as giving immunity to liability in cases such as the present one. It would be in harmony with our cases if comment k were read to mean that when drug consumers know of a danger and decide to accept the risk because of hoped-for benefits, strict tort liability cannot fairly attach to the dispenser of such a drug; however, insofar as comment k might be read as justifying release from liability of manufacturers and distributors of "reasonably dangerous" vaccines that are administered throughout our population and read as placing the burden of loss on the consumer, we must reject any such interpretation. It must be remembered that these inoculation programs are nationwide and that those who are required to take the vaccines have little or no choice as to whether to take them or not. We see no public policy need for changing our law or for shifting from the drug manufacturers to the consumer/victim the responsibility for all of the "unfortunate consequences" suffered by the Allisons of the world. If this kind of reallocation of resources is to be made, it is properly a legislative rather than a judicial function to do so. Considerable research and legislative committee activity would be necessary before an intelligent and informed judgment could be made as to whether we should leave "unfortunate" victims of drug injury to their own resources and free drug manufacturers from tort liability, on the unsubstantiated pretext that such a drastic measure is necessary in order to encourage drug research and development.

STRICT TORT LIABILITY MAY BE IMPOSED EVEN IF MERCK'S INTERPRETATION OF COMMENT K WERE ACCEPTED
This court rejects the idea of freeing drug manufacturers from liability for defective drugs simply because they claim that the drugs are reasonably or unavoidably dangerous. However, even if, like the dissenting justice, we were to accept Merck's interpretation of comment k in this case, Thomas and his mother would still be entitled to a trial. A factfinder could find in this case that the product here, if not defective or dangerous "per se," was "unreasonably dangerous as marketed." Reyes v. Wyeth Laboratories, 498 F.2d 1264, 1273 (5th Cir.1974). Reyes noted that "[i]n terms of the user's interests, a product is `unreasonably dangerous' only when it is `dangerous to an extent beyond that contemplated by the ordinary consumer.'"[11]Id. (quoting Restatement (Second) of Torts § 402A cmt. i (1965)). Citing to comment k, the Reyes court thus held that even an "unavoidably" unsafe vaccine may be defective if marketed without an adequate warning. Id. at 1274-78. Accordingly, under the Reyes rationale, even under the broadly exculpatory interpretation of comment k espoused by Merck, liability cannot be avoided by a drug manufacturer and distributor in the marketing of a vaccine unless the vaccine is "accompanied by proper directions and warning." Id. at 1274 (quoting Restatement (Second) of Torts § 402A cmt. k (1965)).[12]
*957 It would appear that a factfinder in this case could reasonably conclude that the vaccine given to Thomas Allison was not accompanied by a proper warning.[13] Although Merck does not admit that this vaccine can cause disastrous central nervous system disorders, it announces in its MMR II package circular (which is not distributed to vaccinees) that "significant central nervous system reactions such as encephalitis and encephalopathy occurring within 30 days after vaccination, have been temporally associated with measles vaccine approximately once for every million doses." (Emphasis added.) In dealing with the mass consumers of the vaccine, the Health District revised this information when it issued its "Important Information" (not a "Warning") flyer prepared by the Center for Disease Control ("CDC"). The "Important Information" flyer is a revision of Merck's package circular, and it contains a much less dissuading statement, namely, that, "[a]lthough experts are not sure," there might be a very remote possibilitya chance in a millionthat takers of the vaccine "may have a more serious reaction, such as inflammation of the brain (encephalitis)." The gist of the faulty warning aspect of liability in this case is that none of the prospective vacinees was warned of the actual possibility of permanent brain damage. Rashes, yes; sore throats, yes; "inflammation of the brain," yes; but permanent blindness, deafness, and mental retardation, no.[14]
Further, there is evidence in the record that Merck underestimated the incidence of serious central nervous system involvement caused by or "temporally associated with" the vaccine.[15] Whether the incidence data be true or not, the information that was ultimately conveyed to Jo Ann Allison could be seen by a factfinder as being slanted and insufficient; and the only information that was actually made available to Ms. Allison was that there was a one in one million [not four in one million] chance that her son "may" have a more serious reaction to the vaccine "such as inflammation of the brain." At no time was Ms. Allison ever made aware that the vaccine might result in *958 her son's becoming an invalid. Accordingly, there is certainly an issue of fact as to whether the warning in this case was "proper"; and, in fact, there appears to be substantial evidence in this case from which a jury could find that the vaccine in question was not "`accompanied by proper directions and warning,'" Reyes 498 F.2d at 1274 (quoting Restatement (Second) of Torts § 402A cmt. k (1965)), especially when that evidence is viewed in the favorable light required on appeal from summary judgment. Consequently, even if we were to accept Merck's version of comment k, the Allisons would still be entitled to a trial on the merits.[16]

MERCK'S CLAIMED CONTRACTUAL DELEGATION OF ITS DUTY TO WARN
Merck claims that since it contracted with the government to provide the necessary warnings to accompany this vaccine, the government, and not Merck, should be liable for any faults in the warning process. As stated above, a jury would be justified in finding that the warnings ultimately given to the consumers were inadequate. Merck wants to be relieved of any responsibility for these faulty warnings because it contracted-out its duty to warn of the dangers inherent in this vaccine.
Merck claims in its brief that it did not participate in the preparation of the "Important Information" form, but does not deny knowing of its contents. Merck puts the "legal question in this case" to be "whether it was negligent for Merck to rely on the Center for Disease Controlthe foremost authority in the world on the subject." A jury could definitely conclude that the answer to this question is, "yes." Almost anyone who reads the Important Information handout should be able to see immediately that it does not warn of the possible risks of blindness, deafness and permanent brain damage. As discussed in the preceding section, a jury could find that the warning given was inadequate and that Merck knew that the warning that was being promulgated with its vaccine was inadequate. This fact accompanied by Merck's admitted knowledge of the Center for Disease Control's bias and concern "that manufacturers would overwarn of the risk of the vaccine," (see footnote 16) tells us that a jury could have properly found that Merck was marketing a substance which it knew was (albeit, "unavoidably") "unsafe," and did so knowing that the accompanying written warnings were inadequate. Thus a jury could reasonably conclude that Merck was negligent in purveying this dangerous vaccine when it was unaccompanied by an adequate warning.[17]
*959 The only question here, as we see it, is whether Merck can free itself from any liability simply by delegating that duty and by contracting out that duty to a third partyin this case the Center for Disease Control. There are two lines of cases on the question of whether a manufacturer can absolve itself of strict liability by delegating its duty of due care to warn of the dangers of a supposedly "unavoidably unsafe" drug. In Mazur v. Merck & Co., Inc., cited by Merck, the Third Circuit Court held that it was permissible for a manufacturer to abdicate its responsibility and turn it over to the CDC, provided that the manufacturer (Merck) did not misinform or mislead the CDC. 964 F.2d 1348, 1368 (3d Cir.), cert. denied, ___ U.S. ___, 113 S.Ct. 463, 121 L.Ed.2d 371 (1992); see also Davis v. Wyeth Laboratories, Inc., 399 F.2d 121 (9th Cir. 1968).
The other, better view is expressed in Petty v. United States, 740 F.2d 1428 (8th Cir. 1984). Petty is right on point here. Petty involved a manufacturer's failure to warn of risks associated with the swine flu vaccine. The court held:
We recognize that the government has attempted to statutorily assume [sic] the duty to warn the vaccinees, however, we do not find that this delegation thereby relieves the manufacturer from liability for any resulting inadequacy of the warning. The duty is imposed on the manufacturer and in a mass-immunization context, ... the duty extends to the ultimate recipient of the vaccine. Delegation of the duty does not, in itself, relieve the manufacturer of its obligation, nor should it insulate the manufacturer from liability for deficiencies in the manner in which the chosen intermediary effectuates the manufacturers duty. Although on the sidelines, Merrill-National [drug company] is assumed to have had the knowledge of the warning issued and to have had the ability to affect the warning.
Id. at 1440; see also In re Jones, 804 F.2d 1133, 1139 (10th Cir.1986) (attempt to limit contractually strict liability for product defects void as against public policy).
Since failure to give proper warning, under all legal theories, renders a product "defective," we conclude that although a manufacturer may decide to assign its duty to warn of the unsafeness of its product to others, a manufacturer cannot be relieved of ultimate responsibility for assuring that its unsafe product is dispensed with a proper warning. Although there is authority to go either way, it seems to us to be far the better rule that Merck should not be allowed to walk away, on summary judgment, from its duty to warn users of the dangers of its vaccine, especially when there is evidence from which a jury could find that the warning actually given was faulty.

GOVERNMENT CONTRACTOR DEFENSE
Merck also argues that the so-called "government contractor defense" operates in this case to relieve it of any liability to the Allisons. This defense is very ill-defined, and we see no justification for applying it to this case. Generally speaking, the defense has been made available to a manufacturer who contracts to produce a military product for the federal government. The idea is that sovereign immunity should be extended to private contractors acting pursuant to and in conformance with a government contract for military equipment. If such contractors can show that the government approved reasonably precise specifications for the product, that the specifications were followed, and that the manufacturer warned the government of dangers known to the manufacturer but not to the government, then, the government contractor defense may be successfully interposed. Boyle v. United Technologies, 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988). The requirements necessary to this defense do not fit very nicely into the present case.
Almost all of the cases relating to the government contractor defense are military cases in which the government has told the manufacturer how to make the product. A good example is a case involving a helicopter which the government designed so that the door would open outward. A man drowned when his helicopter went underwater, and *960 the water pressure on the door prevented his escape. Obviously, the manufacturer should not be held responsible, because the government designed the door. See id.
Merck cites to cases which expand the defense and principally to Boruski v. United States, 803 F.2d 1421 (7th Cir. 1986). Merck was a defendant in that case, which involved the swine flu vaccine. Boruski points out that the "common application of the doctrine has been to military cases," but goes on to quote approvingly from Burgess v. Colorado Serum Co., 772 F.2d 844, 846 (11th Cir.1985), in which it was said:
"Both the history of the defense and its general rationale lead us to the conclusion that it would be illogical to limit the availability of the defense solely to `military' contractors. If a contractor has acted in the sovereign's stead and can prove the elements of the defense, then he should not be denied the extension of sovereign immunity that is the government contract defense."
Boruski, 803 F.2d at 1430. Even if we were inclined to follow Boruski and apply the defense to drug cases, there is a serious question of fact in this case as to whether Merck was acting in the sovereign's stead. It would appear that it was not. The extent to which the government may have provided precise designs and specifications for this vaccine is certainly a matter that is up to question.[18]
In Nielson v. George Diamond Vogel Paint Co., 892 F.2d 1450 (9th Cir.1990), a civilian employee of the Army Corps of Engineers painted a dam in Idaho over a period of several years, using a certain type of paint. Id. at 1451. The employee was diagnosed as suffering from brain damage as a result of inhaling the toxic paint fumes. Nielson brought suit against two paint manufacturers, alleging strict liability for manufacturing defect, inadequate warnings and negligent production. In denying the government contractor defense, the Ninth Circuit Court stated: "We do not read Boyle to establish the broad immunity for all government procurement contractors urged by the defendants...." Id. The Ninth Circuit Court observed that the "underlying premise" of the defense was not limited to the military context, but that contractors are not, in reliance on Boyle, to be broadly immunized from their own negligence. Id. at 1455. The Ninth Circuit Court further noted that "the policy behind the defense remains rooted in considerations peculiar to the military," id. at 1454-55, and that the reasons for shielding government contractors from liability are "peculiar to the military field," id. at 1454. Noting Justice Scalia's reasoning in Boyle, the court stated that the defense is most applicable where there is a need to "[avoid] scrutiny of sensitive military decisions, as, for example, the design of a fighter plane." Id. Of course, no such concerns apply here. See also In re Hawaii Federal Asbestos Cases, 715 F.Supp. 298, 300 (D.Hawaii 1988) ("the Boyle opinion applies only to military equipment"), aff'd, 960 F.2d 806 (9th Cir.1992).
We find no case, including Boruski, that would lead us to relieve Merck from liability by reason of the government contractor defense.

FEDERAL PREEMPTION
As mentioned previously, four years after Thomas suffered his injuries, the United States Congress enacted the "National Childhood Vaccine Injury Act of 1986." This Act provides for limited compensation by the federal government for injured vaccinees who had civil actions pending at the time the Act was passed, provided the injured vaccinee was willing to dismiss the pending litigation. See 42 U.S.C. §§ 300aa-11(a)(5)(A), 300aa-15(b) (Supp.1992). The Act does not require litigants to dismiss their lawsuits; rather, it permits litigants to "elect" to forestall pending tort claims and to accept the limited largesse offered by the government. Id. These tort claimants' decisions not to pursue claims under the National Childhood Vaccine Injury Act do not preclude them *961 from pursuing their tort claims if they elect to do so. Certainly the Act contains no express language which would preempt the Allison's tort actions.

CONCLUSION
Viewing the facts in the light most favorable to the Allisons, Thomas is entitled under Nevada law to pursue an action against Merck under a strict tort liability theory. Also, it appears that the Allisons did not receive fair warning as to the vaccine's true danger and that they never had any real choice as to whether Thomas Allison was to be vaccinated. Comment k cannot be invoked to exculpate Merck from strict tort liability, and this case can be distinguished from the kinds of cases represented in the rabies example relied upon in comment k. It is one thing to proffer a medicine to a prospective user, saying: "You have a pernicious disease. We have a medicine that has serious side effects, even, possibly, blindness and deafness. You make the choice." It is quite another thing to say: "You must have your son vaccinated or he cannot go to school. Your son might get a rash or, on `one out of a million' odds, might get a `brain inflammation.'" In the first case, the user's knowing acceptance of the risks frees the purveyor of liability. In the second case, the traditional public policy behind strict product liability comes into play. Ms. Allison did not and could not have bargained for this misfortune. She had no real choice. "[T]he burden of accidental injuries caused by products intended for consumption [must] be placed upon those who market them." Restatement (Second) of Torts, § 402 A, cmt. c (1965).
In summary, if we apply the principles of product liability law that have been in effect in this state since Shoshone Coca-Cola Co. v. Dolinski, 82 Nev. 439, 420 P.2d 855 (1966), Thomas Allison is entitled to try to prove to a factfinder that the vaccine caused his disabilities and that the vaccine was defective and unsafe, because, under Ginnis v. Mapes Hotel Corp., 86 Nev. 408, 470 P.2d 135 (1970), the vaccine failed to perform in the manner reasonably to be expected of a vaccine. Further, even if we were, as some courts apparently have done, to accept the exculpatory, "unavoidably unsafe" interpretation of comment k, it is quite clear that there is a jury issue in this case as to whether the vaccine was "safe as marketed," that is to say whether it was marketed with an adequate warning.
We reverse the summary judgment in favor of Merck on Thomas Allison's strict liability claim and on Thomas' and Ms. Allison's failure-to-warn claims and remand for trial. We affirm the judgment in all other respects.
SHEARING, J., concurs.
ROSE, Chief Justice, concurring:
I concur with the results of the majority opinion, but reach my conclusion on the viability of Allison's claims against Merck on a different basis. I would adopt comment k of the Restatement (Second) of Torts § 402A (1965), but conclude that there remains a triable issue of fact concerning whether an adequate warning was given.
The dissenting opinion concludes that there is no issue of fact because Merck has established two viable defenses to the claim of failure to warn: that the government had contractually assumed the duty to warn and the government contractor defense. Admittedly, there is authority that relieves a drug manufacturer of the duty to warn by obligating the purchaser to give the warning. See Walker v. Merck and Company, 648 F.Supp. 931 (M.D.Ga.1986), aff'd, 831 F.2d 1069 (11th Cir.1987); Boruski v. United States, 803 F.2d 1421 (7th Cir.1986). However, I believe the better view is to hold that the manufacturer of a drug should not be able to delegate this critical task to a third personespecially when it has reason to believe that the third party has an incentive or mind-set to underwarn about the drug's potential dangers. See Petty v. U.S., 740 F.2d 1428 (8th Cir. 1984).
Additionally, I reject the assertion that the government contractor defense shields Merck from liability. The government contractor defense began with construction contractors and was extended by several courts to provide a defense for military contractors in military equipment design defect cases. McKay v. Rockwell Int'l Corp., 704 F.2d 444, *962 448 (9th Cir.1983), cert. denied, 464 U.S. 1043, 104 S.Ct. 711, 79 L.Ed.2d 175 (1984). The defense has been further extended to non-military contractors in design defect cases. Carley v. Wheeled Coach, 991 F.2d 1117 (3d Cir.1993); Boruski v. United States, 803 F.2d 1421 (7th Cir.1986).
As the dissent points out, most cases applying the government contractor defense have involved public works projects or military procurement contracts where the government was involved in either dictating or approving specific plans or designs. The rationale for the defense is to shield contractors from liability for product design defects where the government played a fairly significant role in its design. The reason for establishing such a defense is much less compelling when companies do not design and manufacture a product pursuant to government specification, as in the instant case. Therefore, I favor rejecting the defense when drug companies contract with the government. See Chapman v. Westinghouse Elec. Corp., 911 F.2d 267, 271-72 (9th Cir.1990) (holding that in the absence of evidence that the government "provided or approved design specifications as to the design or manufacture" of the product, the government contractor defense could not be invoked); Nielson v. George Diamond Vogel Paint Co., 892 F.2d 1450, 1455 (9th Cir.1990) (holding that the defense does not broadly immunize contractors from their own negligence and applying state tort law in the absence of a significant conflict with federal policy).
Once we conclude that Merck was responsible for providing an adequate warning, we must review the facts to see if Allison has presented a viable factual issue. I believe she has. The Important Information Sheet reads: "Although experts are not sure, it seems that about 1 out of a million children who get measles or mumps vaccines may have a more serious reaction, such as inflammation of the brain (encephalitis)." Allison's experts, however, presented information and opinions that the incidence of adverse reactions was considerably higher, at least 4.5 per million doses rather than 1 per million.
Additionally, a review of the entire fact sheet reveals that it is confusing and seems, at one point, to unreasonably understate the usually severe consequences of encephalitis. The Important Information Sheet states that 1 in 20 children with natural mumps contracts a mild type of meningitis, and then goes on to state: "More rarely, it can cause... (encephalitis) which usually goes away without leaving permanent damage." This statement, when read in conjunction with the statement that possibly 1 out of a million children will suffer encephalitis as a result of the vaccine, may mislead the reader into thinking that encephalitis suffered as a result of the vaccine is temporary and not severe a conclusion which this case proves is incorrect.
Summary judgment is inappropriate when there is the slightest doubt of the material facts. Doud v. Las Vegas Hilton Corp., 109 Nev. 1096, 864 P.2d 796 (1993). I conclude that a factual issue was presented by Allison with regard to the adequacy of the warning contained in the Important Information Sheet. Therefore, I concur with the remanding of this case for the trial of Allison's claims against Merck.
YOUNG, Justice, with whom STEFFEN, J., agrees, concurring in part and dissenting in part:
While I concur with Justice Springer's opinion as to CCHD, I respectfully dissent from his opinion as to Merck. This court's decisions must be guided not by emotion but by the law, no matter how troubling the facts. And yet, today's decision seems to be directed by something other than our current law.
This case comes before us following an order granting summary judgment for Merck. Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, demonstrates that no genuine issue of material fact remains in dispute, and that the moving party is entitled to judgment as a matter of law. Caughlin Homeowners Ass'n v. Caughlin Club, 109 Nev. 264, 849 P.2d 310 (1993). On appeal, this court's review of an order granting summary judgment is de novo. Walker v. American Bankers Ins., 108 Nev. 533, 836 P.2d 59 (1992).
While I recognize that de novo review is the standard, I am unable to discern any *963 error on the part of the district court, either factually or legally, such that I would have come to a different conclusion. Accordingly, I am of the opinion that summary judgment was proper in this case in light of the lack of any disputed issues of material fact.
Initially, I note that Justice Springer's opinion fails to include a full account of the relevant facts. Therefore, I will set forth the following facts which I feel are essential for a complete understanding and disposition of this case.

THE FACTS OF THE CASE
In December 1982, Dr. Del Potter informed Mrs. Allison that it was time to have her 17-month-old son Thomas vaccinated against measles, mumps and rubella. Mrs. Allison had previously consented to vaccinations for Thomas for polio, diphtheria, tetanus and pertussis. Dr. Potter prescribed the MMR II vaccination for Thomas and informed Mrs. Allison that either he or CCHD could administer it.
Dr. Potter was in possession of a detailed package insert from Merck regarding the MMR II vaccine and its possible side effects.[1] In addition, Dr. Potter was aware of the statistical incidence of encephalitis from the MMR II vaccine. However, he testified that he did not warn Mrs. Allison because he did not wish to alarm her and because the statistical occurrence of encephalitis was so low as to present a nearly negligible risk. He instructed Mrs. Allison to contact him should Thomas suffer any untoward symptoms following vaccination.
On December 28, 1982, Mrs. Allison took Thomas to CCHD to receive his free MMR *964 II vaccination. Mrs. Allison was given an information sheet entitled "Important Information about Measles, Mumps, and Rubella, and Measles, Mumps, and Rubella Vaccines." The information sheet stated that 1 out of 1,000 children with natural measles develops an inflammation of the brain (encephalitis), which can lead to convulsions, deafness, or mental retardation, and that 1 in 10,000 children with natural measles dies from the condition. The information sheet also stated that 1 in 20 children with natural mumps contracts a mild type of meningitis, and that "[m]ore rarely, it can cause ... (encephalitis) which usually goes away without leaving permanent damage." The information sheet also contained a paragraph which provided:
POSSIBLE SIDE EFFECTS FROM THE VACCINES: About 1 out of 5 children will get a rash or slight fever 1 or 2 weeks after getting measles vaccine. Occasionally there is a mild swelling of the salivary glands after mumps vaccination. Although experts are not sure, it seems that about 1 out of a million children who get measles or mumps vaccines may have a more serious reaction, such as inflammation of the brain (encephalitis).
Two other pertinent paragraphs of the information sheet provided:
QUESTIONS: If you have any questions about measles, mumps or rubella vaccinations, please ask us now or call your doctor or health department before you sign this form.
REACTIONS: If the person who received the vaccination gets sick and visits a doctor, hospital, or clinic in the 4 weeks after vaccination, please report it to:
CLARK COUNTY HEALTH DISTRICT, 338-1357[.]
Mrs. Allison authorized Thomas' MMR II vaccination by signing the information sheet in a space provided after the following language: "I have read the information provided on this form.... I have had a chance to ask questions which were answered to my satisfaction. I believe I understand the benefits and risks of measles, mumps and rubella vaccines...." In addition, Mrs. Allison was given the opportunity to ask any questions about the dangers of the MMR II vaccine.
Three days after receiving the MMR II vaccine, Thomas developed a temperature of 102 degrees. He later developed encephalitis which resulted in severe injuries. Mrs. Allison filed suit individually and in her capacity as natural parent and guardian of Thomas against Merck, Clark County and CCHD. Clark County was later dismissed.
Eventually, the district court orally ruled that it would grant summary judgment to both Merck and CCHD. After Mrs. Allison moved for reconsideration and a hearing was held, the court entered its order granting summary judgment to both Merck and CCHD. Specifically, the district court held the following as to Merck: 1) the federal government had assumed, under its contract with Merck, the duty to provide adequate warnings to vaccine recipients; 2) Merck was entitled to immunity from suit under the government contractor's defense; and 3) the MMR II vaccine was an unavoidably unsafe product not subject to strict liability.

EVIDENCE SUPPORTING SUMMARY JUDGMENT
As to the district court's initial order granting summary judgment, I note that the court found that there was no allegation that the MMR II vaccine was defectively manufactured. In addition, the court found that the Allisons' expert, Dr. Geraghty, based his conclusions as to the incidence of encephalitis following receipt of the MMR II vaccine on discussions with unidentified persons who had done informal calculations. Specifically, the court found that the only competent statistical evidence provided to the court revealed that the incidence of serious reactions to MMR II was one in one million.
In addition, plaintiff's co-counsel, David Greenhaw, claimed that he had reviewed thousands of CDC adverse reaction reports and had discovered that the MMR II vaccine had been associated with 125 serious reactions over a three and one-half year period. However, the court found that Greenhaw's affidavit did not state how many such vaccinations had been administered during that time and thus presented no basis for contesting *965 the accuracy of Merck's warnings. I can find nothing in the record to refute the district court's findings on this issue.
I also note that upon reconsideration of the initial order granting summary judgment, the Allisons presented a new affidavit from Dr. Geraghty as well as a letter from another expert, Dr. David Benjamin. However, the court found that this additional information, which was presented to bolster the Allisons' claim that Merck had understated the risk, involved foreign studies of various vaccines utilizing differing viral strains in the manufacturing process. Specifically, the court found that the Allisons had offered nothing which indicated that the figures in the important information sheet were inaccurate.
In granting summary judgment for Merck, the district court held that there were no material issues of disputed fact. In doing so, the court found that the Allisons had failed to present sufficient evidence to overcome a summary judgment challenge from Merck. I find nothing in the record to refute such a finding and accordingly would affirm the court's order of summary judgment.

STRICT LIABILITY
Justice Springer writes that Merck may be liable under our strict liability case law for defective products. In order to establish strict liability, the plaintiff must first establish that there was a defect in the product. Shoshone Coca-Cola v. Dolinski, 82 Nev. 439, 443, 420 P.2d 855, 858 (1966). Therefore, it follows that the Allisons must show that there was a defect in the MMR II vaccine that Thomas received in order to establish strict liability on the part of Merck. However, Justice Springer's opinion appears reminiscent not of strict liability, but rather res ipsa loquitur which provides that certain types of accidents do not occur in the absence of negligence. He holds that if Thomas can establish that he was injured by the vaccine, then ipso facto the vaccine is defective, and thus Merck may be held strictly liable. Therefore, according to Justice Springer, the only issue remaining is causation although he neglects to elaborate just how that causation may be shown. This is surely not strict liability in accordance with our guidelines set down in Shoshone Coca-Cola.
Justice Springer goes on to assume without explanation that the vaccine in question was somehow "malfunctioning." While this may have been true, an injury alone is not sufficient to establish such a defect in the product for purposes of strict liability. Only when a defect in the vaccine is shown, causing it to be unreasonably dangerous, is Thomas then permitted to argue that the defect caused his injuries. This was not the case here. If we are to follow Shoshone Coca-Cola as Justice Springer says, we must not forget this essential step.

COMMENT k
Justice Springer expresses great disapproval of comment k of Section 402A of the Restatement (Second) of Torts (1965), holding that in this state a drug manufacturer will be held strictly liable for any injuries caused by the drug even if the drug is "`properly prepared and marketed' and even when the known danger inherent in the drug may be what the comment calls `reasonable.'" I fear that the result of this holding will be that this state will never allow a drug company to benefit from the protections of this comment. While I agree that comment k should not provide blanket protection to all drug manufacturers of any FDA approved drugs,[2] I am of the opinion that those manufacturers of drugs that are clearly useful and desirable should be afforded such protection. Accordingly, I believe that a better way is to apply a balancing test weighing the benefits of the particular drug against the risks inherent in the use of the drug. See Toner v. Lederle Laboratories, 112 Idaho 328, 732 P.2d 297, 308 (1987) ("The products comment k shields cannot be designed to be more safe at the time of distribution, but bestow benefits which clearly appear at the time of distribution to outweigh their concomitant risks."); Castrignano v. E.R. Squibb & Sons, 546 A.2d *966 775 (R.I.1988). It is clear that the benefits of the MMR II vaccine far outweigh the risks.
According to Health and Human Services Secretary Donna Shalala, more turkeys, chickens and household pets are immunized in this country than preschool children. Donna E. Shalala, Secretary of Health and Human Services, Make Each Week Immunization Week, Chi. Trib., April 26, 1994, at 20. Due to this recent decrease in immunization, outbreaks of diseases long thought to be eradicated, such as measles, polio and whooping cough, are increasing at an alarming rate. Between 1989 and 1991, a measles epidemic left 132 people dead and 11,000 hospitalized, many of them under the age of two. Id. The only method of protection from these highly contagious and sometimes fatal childhood diseases is the widespread use of vaccines. And yet, few pharmaceutical manufacturers are willing to produce vaccines due to the increasing risk of litigation. I fear a decision such as the court is making today will only serve to further inhibit the development and production of such life-saving vaccines.
The record includes a recommendation of the CDC's Immunization Practices Advisory Committee regarding measles prevention. Recommendation of the Immunization Practices Advisory Committee (ACIP), Measles Prevention, Morbidity and Mortality Weekly Report, May 7, 1982, at 217-31. The article states that encephalitis occurred in approximately 1 out of every 2,000 cases of natural measles, often resulting in permanent brain damage and mental retardation, and death is said to have resulted in 1 out of every 3,000 measles cases. The article further states that prior to the introduction of the measles vaccine, 400,000 measles cases were reported every year. Since licensure of the vaccine in 1963, there has been a ninety-nine percent reduction in the reported incidence of measles. The article also states that with 131 million doses of measles vaccine distributed throughout the United States through 1981, encephalitis and encephalopathy were reported approximately once per million doses. Finally the article claims that "[t]he incidence rate of encephalitis or encephalopathy following measles vaccine is lower than the observed incidence of encephalitis of unknown etiology, suggesting that some or most of the reported severe neurological disorders may be only temporally related to measles vaccination rather than due to vaccination." Id. at 221.
Given the figures derived by the CDC as of May 1982, there is little question that the vaccine at issue has produced a major benefit for the majority of this country's population. At the same time, the incidence of adverse reactions resulting in serious injuries is very rare. Such information illustrates that this is an unavoidably unsafe and yet not unreasonably dangerous drug. Accordingly, the MMR II vaccine is extremely beneficial and thus its manufacturer deserves comment k protection from strict liability.
The purpose of comment k is to provide protection for manufacturers of products that are unavoidably unsafe. As the comment mentions, vaccines which can be made no safer are the best examples of such products whose benefits outweigh their risks. Companies whose vaccines are recognized to be highly beneficial but which can be made no safer should be given the protection provided by comment k. To do so would not be such an affront to our system of products liability law as Justice Springer opines, but rather a wise and logical extension of that law.
Mazur v. Merck & Co., Inc., 964 F.2d 1348, 1353 (3d Cir.), cert. denied, ___ U.S. ___, 113 S.Ct. 463, 121 L.Ed.2d 371 (1992), a case cited but distinguished by Justice Springer is factually remarkably similar to the case at bar. Mazur involved a child who received the very same MMR II vaccine in the same year as Thomas. The vaccine administered in Mazur was part of the same contract between CDC and Merck as the vaccine in this case. In addition, that vaccine was administered at a time when the same Important Information sheet was being given to the parents of all children being vaccinated with MMR II as was given to Mrs. Allison. When the Mazur child suffered subacute sclerosing panencephalitis (SSPE) following the vaccination, the Mazurs filed an action against Merck alleging negligence and strict liability for failure to provide an adequate warning.
*967 The Mazur court held that if a product is unavoidably unsafe but not unreasonably dangerous under comment k, the strict liability principles in Section 402A do not apply. The court held that under such circumstances, the drug company's duty to warn is analyzed under Section 388. Id. at 1354. Section 388 provides that the supplier of a chattel is liable if it fails to exercise reasonable care to inform the user of the chattel's dangerous condition or of the facts which make it likely to be dangerous.
As can be seen in Mazur, the use of comment k and the duty to warn are intrinsically linked. As I have stated, I believe comment k should apply in this case. However, whether Merck is provided with protection depends upon whether it fulfilled its duty to sufficiently warn the Allisons of the potential dangers of the MMR II vaccine.

DUTY TO WARN
Justice Springer asserts that the faulty warning aspect of liability in this case is that no prospective vaccinees were warned of the actual possibility of permanent brain damage. While Mrs. Allison was not warned that her son might become an invalid, she was warned by the CDC information sheet of the possible side effects of the vaccines. However, I question Justice Springer's assertions. At what point is the line to be drawn? Must a manufacturer who has properly prepared the product warn of every possible side effect, no matter how infinitesimal the possibility? How vast must the warnings be? I am of the opinion that a reasonableness standard should apply, and I conclude that Merck's warnings were reasonable in this case in light of the state of medical knowledge in 1982.
The Mazur court came to this same conclusion regarding Merck's fulfillment of its duty to warn. Again, Mazur involved the very same vaccine as the one Thomas received. There, the United States Court of Appeals for the Third Circuit concluded that based upon the state of medical knowledge at the time the vaccine was received in 1982, the warnings provided by Merck were adequate. Mazur, 964 F.2d at 1367. Specifically, the court found that Merck had adequately informed the CDC of the facts which make the MMR II vaccine dangerous. Id.
As the court found in Reyes v. Wyeth Laboratories, 498 F.2d 1264, 1275 (5th Cir. 1974), failure to properly warn will render a product unreasonably dangerous under the Restatement. However, Reyes, the case upon which Justice Springer relies, is factually different from the instant case. Reyes involved a child who developed polio after receiving a Sabin oral polio vaccine in 1970. The child's mother had apparently been given no warnings as to the possibility of her child contracting polio after receiving the vaccine. The Reyes court held that the vaccine manufacturer had a duty to warn of possible side effects of the drug, a duty it had failed to fulfill. Id. at 1279. However, the court noted that while the danger of contracting polio from the vaccine was small, "the risk appear[ed] to be distributed evenly among that substantial segment of the population that is not naturally immune to polio." Id. Clearly, there was a far greater risk of harm from the polio vaccine than from the MMR II vaccine. Therefore, the standard in Reyes is not applicable here, particularly in light of the warnings Merck provided to the CDC.
In the instant case, Mrs. Allison received warnings of possible side effects from the CDC, not Merck. Hence, the relevant inquiry is whether Merck provided the CDC with all possible data and whether Merck acted reasonably in contracting with the CDC to provide warnings to all vaccine recipients.

CONTRACTUAL DELEGATION OF THE DUTY TO WARN
Justice Springer states that a manufacturer cannot be relieved of ultimate responsibility for assuring that its product is dispensed with a proper warning. I agree. However, I believe that a manufacturer must be judged using a reasonableness standard as to whether it reasonably relied on the ultimate dispenser of the drug to warn recipients. Accordingly, the issue in this case is whether Merck reasonably relied upon the CDC to provide adequate warnings to the recipients of the MMR II vaccine.
*968 Merck points out that the Important Information sheet given to Mrs. Allison was prepared by the CDC in conjunction with the CDC's Immunization Practices Advisory Committee. Merck maintains that since the CDC possessed the most comprehensive information on the subject, having monitored over 131 million measles vaccinations from 1963 to 1981, Merck can hardly be considered unreasonable in having relied upon the CDC to formulate the Important Information sheet.
I am inclined to agree with Merck. The contract provision at issue provided in part:
DUTY TO WARN:
A. The Department of Health, Education, and Welfare, Public Health Service, Center for Disease Control, represents and agrees that it will (1) take all appropriate steps to assure that all vaccine supplied ... pursuant to the terms of this contract, shall be administered to each patient on the basis of an individualized medical judgment by a physician, or (2) take all appropriate steps to provide to such patient (or the patient's parent or guardian) meaningful warnings relating to the risks and benefits of vaccination, in form and language understandable to such patient, parent, or guardian.
It was not merely Merck's decision to have the CDC provide the warning that Mrs. Allison ultimately received. Retired CDC physician Harold B. Dull stated in his affidavit that the CDC requires state health departments to use the CDC's Important Information sheet whenever federally funded vaccines are administered. The MMR II vaccine that Thomas received was administered at no charge by CCHD under a program funded by state and federal grants. Dull stated that this requirement has been in effect since 1976 due to CDC concerns that vaccine manufacturers would overwarn potential vaccinees and thus discourage the use of vaccines.
In Boruski v. United States, 803 F.2d 1421, 1429 (7th Cir.1986), the court held that because the government had contractually agreed with Merck to take all appropriate steps to provide vaccinees with meaningful warnings as to the risks associated with swine flu vaccine, the duty to warn had been assumed by the government and "Merck [had] the benefit of this additional defense." However, this finding was mentioned in dicta. The court had already ruled that the duty to warn rested with the government pursuant to § 317(j)(1)(F) of the Swine Flu Act. Id.
In a similar case, a federal court in Georgia ruled that the manufacturer of a polio vaccine, Merck, could fulfill its duty to warn by "`obligating the purchaser [of the drug] to give warning.'" Walker v. Merck and Company, 648 F.Supp. 931, 935 (M.D.Ga.1986), aff'd, 831 F.2d 1069 (11th Cir.1987) (quoting Reyes v. Wyeth Laboratories, 498 F.2d 1264, 1276 (5th Cir.1974)). Reyes borrowed this language from what it termed the leading federal case in the area, Davis v. Wyeth Laboratories, 399 F.2d 121 (9th Cir.1968), cert. denied, 419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688 (1974). In Davis, the court ruled that Wyeth Laboratories had failed to adequately warn of the newly-discovered risks associated with the Sabin oral polio vaccine. The court held that "it is the responsibility of the manufacturer to see that warnings reach the consumer, either by giving warning itself or obligating the purchaser to give warning." Davis, 399 F.2d at 131.
The Mazur court also followed this reasoning in affirming summary judgment in favor of defendant Merck. There, the court held that a manufacturer may be relieved of its duty to warn provided that it gave the CDC all relevant information and in no way misinformed the CDC. Mazur, 964 F.2d at 1368. The court concluded as a matter of law that Merck acted reasonably in relying on the CDC to issue proper warnings, noting that Merck had carefully researched the CDC before agreeing to sell the MMR II vaccine, as well as monitored the CDC's performance after it made its decision to rely on the CDC. Id.
In view of the foregoing authorities, which all involved failure to warn claims, it is clear that a pharmaceutical manufacturer may fulfill its duty to warn the ultimate consumer by obligating the purchaser of the vaccine to warn. Therefore, Merck could fulfill this *969 duty by obligating the CDC to give warnings to recipients of the MMR II vaccine.
Merck contends that at the time Thomas was vaccinated, it had apprised the Food and Drug Administration (FDA) and the CDC of all adverse reaction reports which it had received associated with the MMR II vaccine. I find nothing in the record to refute this contention. The CDC monitors the use of vaccines on a nationwide basis and has the most comprehensive and up-to-date information regarding adverse reactions. Therefore, I must conclude that Merck did not act unreasonably in relying on the CDC to formulate a proper warning for all recipients of the MMR II vaccine.

LEARNED INTERMEDIARY DEFENSE
An additional reason why the district court did not err in granting summary judgment to Merck may be found in the learned intermediary defense. This defense is one that this court has never addressed. A learned intermediary was defined in Reyes as a medical expert, such as a prescribing physician, whose task is to weigh the benefits of any medication against possible dangers and to make "an individualized medical judgment bottomed on a knowledge of both patient and palliative." Reyes, 498 F.2d at 1276. The pharmaceutical company's duty, in selling prescription drugs, is to warn "only the prescribing physician, who acts as a `learned intermediary' between manufacturer and consumer." Id.
One exception to this doctrine is what is referred to as the "mass immunization" exception. This exception applies when a vaccine is administered at clinics without a physician. In such cases, it is the duty of the manufacturer to warn the consumer. Reyes, 498 F.2d at 1276; see also Davis, 399 F.2d at 131.
In Stanback v. Parke, Davis and Co., 657 F.2d 642 (4th Cir.1981), the recipient of an influenza vaccine contracted Guillain-Barre Syndrome as a result of the vaccine. The physician had not received the manufacturer's package insert with the vaccine, nor did the package insert warn of the risk of Guillain-Barre Syndrome associated with the vaccine. However, the physician testified that he was aware of the risk, but that it was not his practice to warn patients of the risks associated with the influenza vaccine. Consequently, the patient received no warnings prior to receiving the vaccine. The court concluded that even if the manufacturer had sufficiently warned the physician, the patient would not have received the warning. Id. at 645. The court held that the physician's "decisions and actionsmade in full knowledge of the information which an adequate warning would have containedtherefore insulate Parke, Davis from any liability resulting from its failure to warn." Id.
In the instant case, Dr. Potter advised Mrs. Allison that her son needed to be vaccinated against measles, mumps and rubella. He then prescribed the MMR II vaccine. He was in possession of the package insert provided by Merck containing information regarding adverse reactions. Yet, Dr. Potter failed to provide Mrs. Allison with any information or warnings regarding the possibility of side effects such as encephalitis. Had Mrs. Allison chosen not to go to CCHD for the vaccination, Dr. Potter, in all probability, would have administered the MMR II vaccine. Therefore, I must conclude that Dr. Potter, as the prescribing physician, was a learned intermediary in this case, one to whom Merck had a duty to warn of possible adverse reactions of the MMR II vaccine. Merck fulfilled this duty by providing prescribing physicians with the package insert containing all relevant information regarding adverse reactions. While Thomas received the vaccination at CCHD, it was Dr. Potter who, without warning Mrs. Allison, prescribed the vaccination based upon his medical knowledge. Merck should not be held liable simply because the learned intermediary failed to perform his duty to warn his patient. Stanback, 657 F.2d at 645.

GOVERNMENT CONTRACTOR DEFENSE
The United States Supreme Court has held that a manufacturer who contracts to produce a product for the federal government qualifies for the government contractor defense if it shows (1) the federal government approved reasonably precise specifications *970 for the product; (2) the product conformed to those specifications; and (3) the manufacturer warned the government of any dangers of the product known to the manufacturer but not the government. Boyle v. United Technologies Corp., 487 U.S. 500, 513, 108 S.Ct. 2510, 2519, 101 L.Ed.2d 442 (1988). In his opinion, Justice Springer holds that this defense is inapplicable to nonmilitary contractors. However, I see no reason to exclude such contractors from this defense.
As Merck points out, the defense appears to have originated in Yearsley v. Ross Constr. Co., 309 U.S. 18, 60 S.Ct. 413, 84 L.Ed. 554 (1940), where the Supreme Court held that respondent could not be held liable for taking petitioners' land since respondent had been widening the Missouri River pursuant to a contract with, and under the direction of, the United States government as authorized by an act of Congress. The United States Court of Appeals for the Ninth Circuit later cited Yearsley as the grandfather of the defense and stated that "while the government contractor defense covered at first only construction projects, it has been recently applied by several courts to military equipment design defect cases." McKay v. Rockwell Int'l Corp., 704 F.2d 444, 448 (9th Cir.1983), cert. denied, 464 U.S. 1043, 104 S.Ct. 711, 79 L.Ed.2d 175 (1984).
The United States Court of Appeals for the Third Circuit recently held that the government contractor defense applies outside the military context. Carley v. Wheeled Coach, 991 F.2d 1117 (3d Cir.), cert. denied, ___ U.S. ___, 114 S.Ct. 191, 126 L.Ed.2d 150 (1993). Carley involved a medic who was injured when a government ambulance rolled over. Id. at 1118. Though the court found a material question of fact as to whether the manufacturer had sufficiently warned the government of the ambulance's dangers, it stated that "the government performs a discretionary function when it procures a nonmilitary product with an awareness of its dangers. Therefore, it is clear that the government contractor defense is available to nonmilitary contractors." Id. at 1123.
Thus, while many if not most of the cases dealing with this defense involve military contracts, including the United States Supreme Court's decision in Boyle, I conclude that it also applies outside the military context. As the Boruski court stated, in deeming the defense applicable in a case involving a government contract for the swine flu vaccine,
[b]oth the history of the defense and its general rationale lead us to the conclusion that it would be illogical to limit the availability of the defense solely to `military' contractors. If a contractor has acted in the sovereign's stead and can prove the elements of the defense, then he should not be denied the extension of sovereign immunity that is the government contract defense.
Boruski, 803 F.2d at 1430 (citing Burgess v. Colorado Serum Co., 772 F.2d 844 (11th Cir. 1985)).
Mrs. Allison argues that if this court deems the government contractor defense applicable, Merck has failed to show that the government established "reasonably precise standards." She maintains that while the FDA standards relating to the manufacture, testing, and licensure of the MMR II vaccine "may seem impressive to laymen, there is no showing that the standards are greater than those normally attendant to vaccine development," and that Merck "should not be able to avail [itself] of the protections of the defense merely because they have complied with the industry standard."
Merck maintains that the "reasonably precise specifications" requirement was met because "every `design feature' relating to MMR II is indisputably `considered by a government officer, and not merely the contractor itself.'" This argument was sufficient to satisfy the court in Boruski, 803 F.2d at 1430. Most cases applying the government contractor defense have involved public works projects or military procurement contracts where the government was involved in either dictating or approving specific plans or designs. The rationale for the defense is to shield contractors from liability for product design defects where the government played a fairly significant role in the design.
*971 For example, in Boyle, a helicopter escape hatch was designed to open outward. When the helicopter crashed at sea, the water pressure prevented the hatch from opening and the co-pilot drowned. Plaintiffs contended the death could have been avoided had the hatch opened inward. The United States Supreme Court held the manufacturer not liable, since it had a "duty to manufacture and deliver helicopters with the sort of escape-hatch mechanism shown by the specifications." Boyle, 487 U.S. at 509, 108 S.Ct. at 2517. Although there is no indication in the opinion that the Marine Corps thought about the escape-hatch design, the opinion suggests that by approving the specifications, the Marine Corps "considered" the design and thus the defense applied. Boyle, 487 U.S. at 509, 511, 108 S.Ct. at 2516-18.
Applying this analysis to the instant case, it is clear that the government considered the design features of the MMR II vaccine before approving its use on a nationwide basis. Accordingly, all the requirements for the use of the defense have been satisfied. Boyle, 487 U.S. at 513, 108 S.Ct. at 2519. In view of the increasing number of nonmilitary contracts entered into by the United States with nonmilitary contractors, it seems a very antiquated idea to limit the government contractor's defense to the military. I can see no manifest difference between a military and a nonmilitary contract. Accordingly, I would affirm the district court's holding that the government contractor's defense shielded Merck in this case.

CONCLUSION
This is a tragic case. A young boy has been left in a grievous condition while his mother has been left to suffer her child's pain on a daily basis. Though Thomas and Mrs. Allison are receiving Social Security, Medicaid and Aid to Dependent Children benefits, their lives surely cannot be easy.
And yet, however heartbreaking the facts, we cannot forget the law. Our job is to interpret the law as it applies to each case. However tragic the case may be, we cannot bend or change the law simply to achieve results.
As Cardozo once wrote, we should strive for certainty in our law that will keep it "consistent with verities and principles as broad as the common law itself, and as deep and fundamental as the postulates of justice." Benjamin N. Cardozo, The Growth of the Law 17 (1924). I fear that the court's decision today strays from the certainty of our law to an inconsistent end.
NOTES
[1] We affirm the summary judgment in favor of Clark County Health District. The Health District is not a "seller of products." Accordingly, it cannot be liable under either a warranty or a strict liability theory. See NRS 104.2313-2315; Restatement (Second) of Torts § 402A (1965). Further, there is no issue of fact remaining with respect to the Health District's failure to warn because the Allisons' own expert testified that although the CDC warning utilized by the Health District was inadequate, the Health District met the relevant standard of care by using that warning. Therefore, the district court's entry of summary judgment on the Allisons' failure-to-warn causes of action was also appropriate.
[2] Ms. Allison made a strict liability claim for relief on her own behalf as well, but it was struck as barred by the applicable statute of limitations.
[3] A number of different kinds of legal claims have been asserted by the Allisons against Merck, but the only theories that we see as having any merit are those of strict tort liability and failure to warn.
[4] Indeed, Merck seems to concede that the vaccine was defective, albeit "unavoidably" so. See discussion infra at page 953.
[5] The Dissent suggests this opinion is "reminiscent not of strict liability but rather res ipsa loquitur...." We are not exactly sure what is meant by this, given that res ipsa loquitur is a method of proof whereas strict liability is a theory of recovery. We do note, however, that Stackiewicz does stand for the proposition that plaintiffs may rely on a res ipsa loquitur type of inference to meet their burden of establishing a defect in strict liability cases; as stated above, in Stackiewicz, we held that evidence of a steering malfunction was sufficient circumstantial evidence of a defect or "unreasonably dangerous condition" to support a judgment based on strict product liability in favor of the plaintiff. We also would note that the approach this court took in Stackiewicz is not exceptional. Several courts have held that plaintiffs may rely on circumstantial evidence to establish a product defect. See e.g., Lindsay v. McDonnell Douglas Aircraft Co., 460 F.2d 631 (8th Cir.1972), on remand 352 F.Supp 633, (D.C.), affirmed 485 F.2d 1288 (8th Cir.1973) (new navy jet caught on fire and crashed into oceancourt held that the fire was evidence of a malfunction which in turn was evidence of some defect); Kileen v. General Motors Corp., 421 A.2d 874 (Con.Super.1980); Lee v. Crookston Coca-Cola Bottling Company, 290 Minn. 321, 188 N.W.2d 426 (Sup.Ct.1971); Jagmin v. Simonds, Abrasive Co., 61 Wis.2d 60, 211 N.W.2d 810 (1973). In this case, we merely hold that proof that the MMR II vaccine caused Thomas Allison's injuries is sufficient circumstantial evidence to raise a genuine issue of material fact and allow the issue of product defect to go to the jury.
[6] Merck defends on the ground that these kinds of disasters occur only rarely, perhaps only once in a million times; but this disputed allegation is immaterial, as it was immaterial in Stackiewicz whether there was a low or high incidence of idiopathic steering disorders in Nissan cars. If we are going to subscribe to the basic rationale of strict tort liability set out above and to adhere to our ruling in the Stackiewicz case, then we must, again, if causation can be proved, allow Thomas to recover for the "cost of the injury" and the "overwhelming misfortune" that has befallen him.
[7] Comment k, section 402A, Restatement (Second) of Torts (1965) provides as follows:

k. Unavoidably unsafe products. There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and the use of the vaccine are fully justified, notwithstanding the unavoidable high degree of risk which they involve. Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it unreasonably dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician. It is also true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he [she] has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk.
(Emphasis added.)
[8] "Properly prepared and marketed" means to me simply that the injured consumer is unable to prove that the manufacturer was guilty of negligence. This should not be able to defeat a strict liability action. "Proper warning" is a subject apart and is akin to informed consent. If a consumer uses a dangerous product after having been fairly and properly warned of its dangers, we are really not talking about strict liability at all. See discussion of comment k and voluntary use of dangerous drugs below.
[9] Obviously, the situation in mass immunization projects is quite different from the emergency, voluntarily accepted treatment of rabies cases. Ms. Allison never had any real choice as to whether her son was to receive the vaccine in question. Not only was she, let us say, "strongly encouraged" to make the decision to go ahead with her child's vaccination, she was faced with the Hobson's choice of either having the vaccine administered or not having the privilege of sending her son to private or public school. See NRS 392.435; NRS 394.192. Choosing not to have her son attend school, of course, would have subjected her to criminal penalties unless she had the means to have her son educated at home. NRS 392.200-.210. Even if the Allisons could be seen to have been properly warned of the risk inherent in this vaccine, it is hard to conclude that they freely accepted the risk of the horrible injuries resulting in this case.
[10] In fact, four years after Thomas suffered his injuries, the United States Congress enacted the "National Childhood Vaccine Injury Act of 1986." This Act provides for compensation by the federal government to individuals who have sustained vaccine-related injuries after the effective date of the Act, and limits vaccine manufacturers' liability for vaccine-related injuries sustained after the effective date of the Act. 42 U.S.C. § 300aa-15(a) (1988); 42 U.S.C. § 300aa-11(a)(2)(A) (Supp.1992). The Act also provides for somewhat more limited compensation for injured vaccinees who had civil actions pending at the time the Act was passed, if the injured vaccinees elect to dismiss their pending civil actions. 42 U.S.C. § 300aa-15(b) (Supp. 1992). The Act does not apply to this case as the Allisons did not elect to dismiss their civil action and proceed under the Act, as was their right. In the absence of federal law preemption or state legislative exculpation of drug manufacturers, there is no reason to depart from our existing strict liability jurisprudence. (The National Childhood Vaccine Injury Act is discussed further infra at page 960.)
[11] We find it very difficult to understand what dangerous to an extent beyond that contemplated by the ordinary consumer means. Does it mean that out of the millions of consumers of this vaccine we must search for the prototypical, "ordinary" consumer and ask if that consumer "contemplated" the vaccine to be dangerous? If the expression has any intelligible meaning at all, it is certainly a retreat from traditional products liability principles and a move toward a negligence standard in which the consumer's choice is measured on the basis of what a reasonable and "ordinary" consumer would do under the circumstances. The more we look at the hodgepodge created by the Restatement (Second) of Torts in the area of consumer rights, the more comfortable we feel with following our precedent and the traditional principles of strict liability.
[12] There is also evidence in this case from which a factfinder could conclude that Merck is tortiously liable to the Allisons, under our state common law, for intentional or negligent underwarning of its product. See, e.g., Oak Grove Inv. v. Bell & Gossett Co., 99 Nev. 616, 624, 668 P.2d 1075, 1080 (1983) ("a failure to warn may be a product defect"); Davidson v. Velsicol Chemical Corp., 108 Nev. 591, 592, 834 P.2d 931, 932 (1992), cert. denied, ___ U.S. ___, 113 S.Ct. 1944, 123 L.Ed.2d 650 (1993). This rule is consistent with comment j to section 402A, which establishes liability for failure to warn where the seller "has knowledge, or by the application of reasonable, developed human skill and foresight should have knowledge of ... the danger." Restatement (Second) of Torts § 402A cmt. i (1965). Numerous courts and commentators agree that this theory is properly applied to the makers of prescription drugs. See, e.g., Basko v. Sterling Drug, Inc., 416 F.2d 417, 426 (2d Cir.1969); Woodill v. Parke Davis & Co., 79 Ill.2d 26, 37 Ill.Dec. 304, 402 N.E.2d 194, 197-99 (Ill.1980); Moore v. Vanderloo, 386 N.W.2d 108, 116 (Iowa 1986); John A. Kidwell, The Duty to Warn: A Description of the Model of Decision, 53 Tex. L.Rev. 1375, 1395 (1975); Comment, William R. Murray, Jr., Requiring Omniscience: The Duty to Warn of Scientifically Undiscoverable Product Defects, 71 Geo.L.J. 1635, 1638-39 (1983); Note, Kathleen H. Wilson, The Liability of Pharmaceutical Manufacturers for Unforeseen Adverse Drug Reactions, 48 Fordham L.Rev. 735, 752-53 (1980).
[13] Merck denies any responsibility for underwarning this product, claiming that it contractually delegated its duty to warn to the federal government. This claim is discussed infra at pages 958-59.
[14] The Dissent states that this opinion "asserts that the faulty warning aspect of liability in this case is that no prospective vaccinees were warned of the actual possibility of permanent brain damage." This is not accurate. The crux of this whole section is that the question of the adequacy of the warning given in this case is one for the trier of fact to determine, not this court. It is up to the jury to determine how "vast" a warning must be and "[a]t what point" the line should be drawn. See Dissenting Opinion at page 967.
[15] There is considerable controversy in this case as to whether encephalitis and disabling brain damage is caused by (or "temporally associated" with) use of the vaccine one in one million times or four in one million times, or more, or less. The incidence of catastrophic sequelae of the vaccine is disputed; still, we cannot see how it would make the slightest bit of difference to Ms. Allison in accepting the vaccination whether the chances that her son would be brain damaged were one in one million or four in one million or ten or twenty in a million. She was not told that the kind of injury suffered by her son was even a possibility. The only information that she might have had (assuming that she read the two page information sheet furnished to her by the Health District) was this "blurb":

Although experts are not sure, it seem (sic) that about 1 out of a million children who get measles or mumps vaccines may have a more serious reaction, such as inflammation of the brain (encephalitis).
Whether one out of a million or four out of a million children, or more children "have a more serious reaction, such as inflammation of the brain," is not of any great consequence unless Ms. Allison had been informed that inflammation of the brain might mean deafness, blindness, mental retardation and permanent brain damage.
[16] The Dissent asserts that another reason why summary judgment is appropriate in this case is the applicability of the so-called "learned intermediary defense." The Dissent concludes that the "mass immunization" exception to this defense does not apply in this case, even though Thomas received his vaccination at a clinic without a physician, because "[h]ad Mrs. Allison chosen not to go to CCHD for the vaccination, Dr. Potter, in all probability, would have administered the MMR II vaccine." This is pure speculation. At any rate, we do not believe that Dr. Potter's advice to Ms. Allison that "it was time" for Thomas to receive his MMR II vaccine is the type of individualized medical judgment contemplated by the learned intermediary defense. The fact is the Health District, not Dr. Potter, administered the MMR II vaccine. Accordingly, the mass immunization exception does apply to this case.
[17] One possible explanation why no proper warnings were given to the Allisons or other vaccinees is revealed in the affidavit of Dr. Dull, which has been offered by Merck. Dr. Dull is a retired Center for Disease Control physician, who testified that the CDC had a policy of offering to prepare product information sheets for vaccines because the government feared that otherwise "vaccine manufacturers would overwarn potential vaccinees and thus discourage the use of vaccines." Given the CDC's admitted biases against "discourag[ing] the use of vaccines," a jury could conclude that Merck knew or had reason to know that the CDC was not going to provide the truth about Merck's product and did not, in fact, give proper warning. If a jury were to conclude that Merck had such knowledge, Merck should not, in fairness, be allowed to insulate itself from tort liability simply by saying that it contracted with the CDC to take over all of Merck's responsibility for warning about its "unavoidably unsafe" product. If Merck decided to let the CDC go fast and easy on the warnings in order that people would not be reluctant to take the Merck-manufactured vaccines, Merck, while accepting the financial gain, should not be freed from financial responsibility for the untoward consequences suffered by the Allisons by reason of Thomas' taking the vaccine, especially in light of the possibility that Merck fully realized how inadequate the warning really was.
[18] Unlike the Dissent, we do not accept Merck's claim that the fact that the government has considered "every `design feature' relating to MMR II" is at all dispositive of this issue. Certainly mere government consideration of design specifications or even government approval of such specifications does not as a matter of law immunize manufacturers from liability.
[1] The MMR II package insert contained the following information regarding adverse reactions:

Because of the slightly acidic pH (6.2-6.6) of the vaccine, patients may complain of burning and/or stinging of short duration at the injection site.
The adverse clinical reactions associated with the use of M-M-R II are those expected to follow administration of the monovalent vaccines given separately. These may include malaise, sore throat, headache, fever, and rash; mild local reactions such as erythema, induration, tenderness and regional lymphadenopathy; parotitis, orchitis, thrombocytopenia, and purpura; allergic reactions such as wheal and flare at the injection site or urticaria, and arthritis, arthralgia and polyneuritis.
Moderate fever [101-102.9°F. (38.3-39.4°C)] occurs occasionally, and high fever [above 103°F (39.4°C)] occurs less commonly. On rare occasions, children developing fever may exhibit febrile convulsions. Rash occurs infrequently and is usually minimal, but rarely may be generalized.
Clinical experience with live attenuated measles, mumps and rubella virus vaccines given individually indicates that encephalitis and other nervous system reactions have occurred very rarely. These might also occur with M-M-R II.
Experience from more than 80 million doses of all live measles vaccines given in the U.S. through 1975 indicates that significant central nervous system reactions such as encephalitis and encephalopathy, occurring within 30 days after vaccination, have been temporally associated with measles vaccine approximately once for every million doses. In no case has it been shown that reactions were actually caused by vaccine. The Center for Disease Control has pointed out that "a certain number of cases of encephalitis may be expected to occur in a large childhood population in a defined period of time even when no vaccines are administered." However, the data suggests the possibility that some of these cases may have been caused by measles vaccines. The risk of such serious neurological disorders following live measles virus vaccine administration remains far less than that for encephalitis and encephalopathy with natural measles (one per two thousand reported cases).
There have been isolated reports of ocular palsies and Guillain-Barre syndrome occurring after immunization with vaccines containing live attenuated measles virus. The ocular palsies have occurred approximately 3-24 days following vaccination. No definite causal relationship has been established between either of these events and vaccination.
There have been reports of subacute sclerosing panencephalitis (SSPE) in children who did not have a history of natural measles but did receive measles vaccine. Some of these cases may have resulted from unrecognized measles in the first year of life or possibly from the measles vaccination. Based on estimated nationwide measles vaccine distribution, the association of SSPE cases to measles vaccination is about one case per million vaccine doses distributed. This is far less than the association with natural measles, 5-10 cases of SSPE per million cases of measles. The results of a retrospective case-controlled study conducted by the Center for Disease Control suggest that the overall effect of measles vaccine has been to protect against SSPE by preventing measles with its inherent higher risk of SSPE.
[2] Some courts have chosen to provide blanket protection for drug manufacturers for any drug which has received FDA approval. See, e.g., Grundberg v. Upjohn Co., 813 P.2d 89 (Utah 1991).