141 Nev., Advance Opinion 23

# IN THE SUPREME COURT OF THE STATE OF NEVADA

OSCAR HERNANDEZ,
Appellant,
vs.
THE HOME DEPOT, INC.; AND RIDGE
TOOL COMPANY,
Respondents.

No. 87794

**FILED**

MAY 01 2025

ELIZABETH A. BROWN
CLERK OF SUPREME COURT
BY
CHIEF DEPUTY CLERK

Certified question under NRAP 5 concerning whether a trademark licensor can be held liable under a strict products liability theory when the trademark licensor did not design, manufacture, or distribute the product. United States District Court for the District of Nevada; Andrew P. Gordon, District Judge.

*Question answered.*

Law Office of David Sampson and David F. Sampson, Las Vegas,
for Appellant.

Wilson, Elser, Moskowitz, Edelman & Dicker, LLP, and Rosario Vignali, White Plains, New York, and Ellen S. Bowman, Las Vegas,
for Respondents.

Evans Fears Schuttert McNulty Mickus and Chad R. Fears and Skylar Nicole Arakawa-Pamphilon, Las Vegas,
for Amicus Curiae Product Liability Advisory Council, Inc.

The Powell Law Firm and Tom W. Stewart, Las Vegas; Matthew L. Sharp, Ltd., and Matthew L. Sharp, Reno,
for Amicus Curiae Nevada Justice Association.

BEFORE THE SUPREME COURT, EN BANC.

25-19322

## OPINION

By the Court, CADISH, J.:

The United States District Court for the District of Nevada has certified the following question to this court: "Does Nevada impose strict products liability on an entity whose only involvement with a defective or unreasonably dangerous product is to license its trademark to be used to market the product and where the product and packaging prominently display its trademark?" Embracing the rule set forth in section 14 of the Restatement (Third) of Torts: Products Liability, we conclude that Nevada does not impose strict products liability on such entities. Accordingly, we answer the certified question in the negative.

## FACTS AND PROCEDURAL HISTORY

Through its parent company, respondent Ridge Tool Company had a trademark license agreement with respondent The Home Depot, Inc., under which Home Depot marketed a line of power tools using Ridge Tool Company's "RIDGID" trademark. One of those power tools was a nail gun. The nail gun was designed and manufactured by other companies on Home Depot's behalf, and Home Depot marketed and sold the nail gun under the "RIDGID" name. Appellant Oscar Hernandez allegedly sustained injuries when attempting to drive nails into wood using a RIDGID-branded nail gun purchased from Home Depot. He alleges the nail gun fell on the ground and a nail shot out, hitting him in the chest. Following this incident, Hernandez filed a complaint against Ridge Tool Company and Home Depot (collectively respondents) under theories of (1) strict liability, (2) negligence, (3) breach of express warranty, and (4) breach of implied warranty of fitness. Hernandez's action was removed to the U.S. District Court for the District of Nevada.

 

Respondents moved for summary judgment as to the claims against Ridge Tool Company. They argued that summary judgment was appropriate in part because the law did not support imposing strict liability for an allegedly defective product when Ridge Tool Company's role was limited to licensing the RIDGID trademark to Home Depot and it did not participate in the design, manufacturing, distribution, or sale of the nail gun or formulate any of the warnings. Respondents noted the dearth of caselaw in Nevada on whether a trademark licensor can be held strictly liable but pointed to section 14 of the Restatement (Third) of Torts: Products Liability and trending caselaw since its adoption to argue that such liability should be imposed only when the trademark licensor has substantially participated in the process of bringing the product to market.

Hernandez opposed the motion, pointing to section 400 of the Restatement (Second) of Torts in arguing that he asserted a viable strict products liability claim against Ridge Tool Company as the apparent manufacturer of the nail gun. Hernandez asserted two rationales to impose strict liability against an apparent manufacturer: (1) the trademark is used to convince the consumer of the product's quality, and (2) the purchaser has no means of ascertaining the identity of the true manufacturer where the licensor puts a product out as its own. Hernandez stated that the nail gun itself and the packaging prominently displayed the RIDGID name with no visible indicators that it was made by any other company.

The U.S. District Court granted summary judgment in Ridge Tool Company's favor on all claims except the strict liability claim. It noted that the parties did not dispute that Ridge Tool Company's only involvement with the nail gun was that it licensed the RIDGID trademark to Home Depot. The court further noted respondents claimed that "Ridge

SUPREME COURT
OF
NEVADA

(O) 1947A

3

Tool Company and its affiliated companies were not involved with the design, manufacture, distribution, or sale of the nail gun, nor with the formulation of its warnings." Finding no clearly controlling precedent on whether a plaintiff may sue a trademark licensor for strict products liability under such circumstances, the court reserved ruling on the claim.[1] Instead, it certified the following question to this court: "Does Nevada impose strict products liability on an entity whose only involvement with a defective or unreasonably dangerous product is to license its trademark to be used to market the product and where the product and packaging prominently display its trademark?"

## DISCUSSION

"We have discretion under NRAP 5 to answer questions of Nevada law certified to us by federal courts when no controlling authority exists on those questions of law and they involve 'determinative' matters of the case before the certifying court." *Mack v. Williams*, 138 Nev. 854, 856, 522 P.3d 434, 440 (2022). The question certified here satisfies those parameters, as there is no on-point Nevada precedent and the only claim remaining against Ridge Tool Company hinges on whether it can be held strictly liable for the nail gun's alleged defect. We thus exercise our discretion to answer the question. In doing so, we accept the facts stated in the federal court's certification order. *See In re Fontainebleau Las Vegas Holdings, LLC*, 127 Nev. 941, 953, 267 P.3d 786, 793 (2011) ("[T]his court's review is limited to the facts provided by the certifying court, and we must answer the questions of law posed to us based on those facts.").

---

[1]The federal district court denied summary judgment on that claim without prejudice to respondents refiling it within 30 days of this court's resolution of the certified question.

The federal court's question concerns application of tort law, and in particular whether section 400 of the Restatement (Second) of Torts or section 14 of the Restatement (Third) of Torts: Products Liability governs Hernandez's strict products liability claim against Ridge Tool Company. Hernandez contends that the imposition of strict liability in this scenario is supported by the apparent manufacturer doctrine (AMD), which is addressed in section 400 of the Restatement (Second) of Torts. As he did in the federal court, Hernandez argues that mere licensors may be strictly liable for a product's defect because permitting the use of their trademark convinces the consumer of the product's quality, and it is difficult for a consumer to ascertain the true manufacturer's identity when a licensor prominently displays its trademark on a product's packaging and thus puts the product on the market as its own. Nevada Justice Association (NJA) filed an amicus brief agreeing with Hernandez. NJA also points to policy considerations, asserting that strict products liability in Nevada is guided by consumer protection and section 400 of the Restatement (Second) of Torts is in line with protecting consumers' reasonable expectations. NJA further asserts that trademark licensors should not be able to profit from the commercial value of their trademarks on defective products while sidestepping strict liability claims if the product causes damages.

By contrast, Ridge Tool Company contends that section 14 of the Restatement (Third) of Torts: Products Liability should govern because it represents the trend in American law to absolve trademark licensors of strict products liability unless they substantially participated in the design, manufacture, or distribution of the defective product. The Product Liability Advisory Council, Inc. (PLAC) filed an amicus brief agreeing that section 14 represents the most widely accepted interpretation of the AMD and

SUPREME COURT
OF
NEVADA

(O) 1947A

contending that it should apply here because Nevada jurisprudence supports limiting strict liability to those trademark licensors who exercise control over the product's design, manufacture, and distribution.

In 1965, the authors of the Restatement (Second) of Torts promulgated a revised version of the AMD previously set forth in section 400 of the First Restatement of Torts. The Second Restatement revision provides that "[o]ne who puts out as his own product a chattel manufactured by another is subject to the same liability as though he were its manufacturer." Restatement (Second) of Torts § 400 (Am. L. Inst. 1965). "'One who puts out a chattel' include[s] anyone who supplies it to others . . . ." *Id.* at cmt. a. The Second Restatement authors explained that the AMD "applies only where the actor puts out the chattel as his own product," which occurs in two scenarios. *Id.* at cmt. d. The first is where the "actor frequently causes the chattel to be used in reliance upon [its] care in making it," and the second is where the actor "frequently causes the chattel to be used in reliance upon a belief that [it] has required [the product] to be made properly for [it] and that the actor's reputation is an assurance to the user of the quality of the product." *Id.* Under this rationale, an actor "puts out a chattel as [its] own product when [it] puts it out under [its] name or affixes to it [its] trade name or trademark." *Id.* Unlike the First Restatement, however, the Second Restatement endorses strict products liability against those "who sell[ ] any product in a defective condition unreasonably dangerous to the user or consumer or to [their] property." Restatement (Second) of Torts § 402A & cmt. f; *Ginnis v. Mapes Hotel Corp.*, 86 Nev. 408, 414, 470 P.2d 135, 138 (1970) (embracing section 402A of the Second Restatement).

Some courts applied Section 400 of the Second Restatement to nonseller trademark licensors whose trade name appeared conspicuously on a product. *See, e.g., Brandmarti v. Caterpillar Tractor Co.*, 527 A.2d 134, 139-40 (Pa. Super. Ct. 1987). Yet others declined to impose strict liability without more involvement from the trademark licensor. *See, e.g., Torres v. Goodyear Tire & Rubber Co., Inc.*, 786 P.2d 939, 946-47 (Ariz. 1990) (concluding under common law that trademark licensors who significantly participate in the process of making products are subject to liability as apparent manufacturers); *Hebel v. Sherman Equip.*, 442 N.E.2d 199, 202 (Ill. 1982) (declining to extend strict liability to an entity that was not integrally involved in the chain of distribution); *Burkert v. Petrol Plus of Naugatuck, Inc.*, 579 A.2d 26, 33 (Conn. 1990) (limiting the application of the AMD to entities who sell, lease, gift, or loan the defective product).

In 1998, the authors of section 14 of the Restatement (Third) of Torts: Products Liability presented the AMD in modified form. That section, entitled "Selling or Distributing as One's Own a Product Manufactured by Another," states that "[o]ne engaged in the business of selling or otherwise distributing products who sells or distributes as its own a product manufactured by another is subject to the same liability as though the seller or distributor were the product's manufacturer." Restatement (Third) of Torts: Prod. Liab. § 14 (1998). The authors observed that since the inclusion of section 402A in the Restatement (Second) of Torts, "imposing strict liability on all commercial sellers of defective products for harm caused by product defects, it was questionable whether § 400 remained relevant in the context of products liability." *Id.* at cmt. a. The authors noted that "[o]nce § 402A imposed strict liability on all product sellers it made little, if any, difference whether the seller of a defective

product was a retailer or a manufacturer." *Id.* As some courts had applied the AMD broadly to parties uninvolved in the manufacture or distribution of defective products, comment d clarified when a trademark licensor could be held liable under the AMD for defective products:

> The rule stated in this Section does not, by its terms, apply to the owner of a trademark who licenses a manufacturer to place the licensor's trademark or logo on the manufacturer's product and distribute it as though manufactured by the licensor. In such a case, even if purchasers of the product might assume that the trademark owner was the manufacturer, the licensor does not "sell or distribute as its own a product manufactured by another." Thus, the manufacturer may be liable under §§ 1-4, but the licensor, who does not sell or otherwise distribute products, is not liable under this Section of this Restatement.

*Id.* at cmt. d. Consistent with its reference to sections 1-4, which generally address strict products liability for sellers and distributors who sell a defective product manufactured by another, comment d further observes that if a trademark licensor "participate[s] substantially in the design, manufacture, or distribution of the licensee's products . . . they are treated as sellers of the products bearing their trademarks." *Id.*; *see also Harrison v. B.F. Goodrich Co.*, 881 So. 2d 288, 292 (Miss. Ct. App. 2004) (citing section 14 in concluding strict liability does not apply to a trademark licensor who was not involved in the design, manufacture, or sale of the product); *Lou v. Otis Elevator Co.*, 933 N.E.2d 140, 149-50 (Mass. App. Ct. 2010) (acknowledging the propriety of imposing strict liability in circumstances where a trademark licensor has substantial involvement in the design, manufacture or other activities that place an item in the stream of commerce).

The Illinois Supreme Court made similar observations as those made thereafter by the authors of the Third Restatement, noting that the "aim of the [AMD] clearly was to provide a remedy for consumers injured by unsafe products," an "objective [now] achieved by the doctrine of strict products liability." *Hebel*, 442 N.E.2d at 202. Stated simply, the "function of the [AMD] has, as it were, been absorbed by the theory of sellers' strict liability in tort for injuries caused by unreasonably unsafe products." *Id.*

We conclude that the Restatement (Third) of Torts: Products Liability section 14's rendition of the apparent manufacturer doctrine aligns with policy considerations underlying strict products liability law in Nevada, including consumer protection interests, and therefore adopt the parameters of the AMD stated therein. Imposing strict liability on those entities that are in the best position to eliminate the unsafe characteristics of a product and prevent harm from occurring serves the interest of consumer protection. We have observed that, even absent negligence, "public policy demands that responsibility be fixed wherever it will most effectively reduce the hazards to life and health inherent in defective products that reach the market." *Shoshone Coca-Cola Bottling Co. v. Dolinski*, 82 Nev. 439, 442, 420 P.2d 855, 857 (1966) (quoting *Escola v. Coca Cola Bottling Co.*, 150 P.2d 436, 440 (Cal. 1944) (Traynor, J., concurring)); *see also Allison v. Merck & Co., Inc.*, 110 Nev. 762, 767-68, 878 P.2d 948, 952 (1994) (reiterating the same public policy rationale behind strict products liability).

Imposing strict liability on an entity outside of a defective product's chain of distribution and whose involvement with the defective product is limited to licensing its trademark for marketing purposes, including allowing the licensee to prominently display the trademark on the

product and packaging, does not accomplish this goal. Because a trademark licensor whose role is limited to permitting use of its trade name is not involved in the supply chain, it typically lacks the ability to reduce or remove any hazards from a product it does not design, manufacture, or sell. *See Hebel*, 442 N.E.2d at 205 (observing in relation to the Restatement (Second) of Torts section 400 that the loss caused by a defective product "should be borne by those who create the risk of harm . . . and who are in a position to eliminate the unsafe character of the product and prevent the loss"); *see also Antone v. Greater Ariz. Auto Auction*, 155 P.3d 1074, 1080 (Ariz. Ct. App. 2007) (determining strict liability was inappropriate where there was no evidence that the defendant significantly participated in the chain of commerce). While our dissenting colleagues contend our holding follows "an emerging trend," as discussed above, comment d was formulated more than 25 years ago to make clear the adoption of the rule as articulated in decades of cases interpreting Restatement (Second) of Torts section 400 to not extend strict liability to mere trademark licensors and to reject the few cases holding to the contrary. *See Otis Elevator Co.*, 933 N.E.2d at 148 (observing that comment d to Section 14 was designed in response to varied applications of Section 400 in order to preclude the "application of the [AMD] doctrine to those cases in which the licensor had limited or no involvement in the design or manufacture of the product, while leaving intact its application to cases in which the licensor had substantial participation in the design or manufacture").

We thus conclude that a trademark licensor is not subject to strict liability for product defects when its role is limited to allowing use of its trade name. However, our holding does not foreclose the imposition of strict liability in cases where the trademark licensor occupies a more

SUPREME COURT
OF
NEVADA

(O) 1947A

10

significant role in the product's chain of distribution by substantially participating in the design, manufacture, or distribution of the product. Nor does our holding preclude other claims against licensors that do not sound in strict liability. Most importantly, our decision today leaves unimpeded the ability of injured plaintiffs to pursue strict liability against those who design, manufacture, distribute, or sell a dangerously defective product.

## CONCLUSION

A trademark licensor whose role is limited to licensing its trademark cannot be held strictly liable for damages caused by the defective product because the trademark licensor was not substantially involved in the product's design, manufacture, or distribution. We therefore answer the certified question in the negative.

_____, J.
Cadish

We concur:

_____, C.J.
Herndon

_____, J.
Parraguirre

_____, J.
Stiglich

_____, J.
Lee

SUPREME COURT
OF
NEVADA

(O) 1947A

BELL, J., with whom PICKERING, J., agrees, dissenting:

Today, the majority chooses to follow an emerging trend, that a licensor of a product cannot be held liable for defects in that product, even when the product on its face appears to be entirely designed or manufactured by the licensor. But a trend is just that—a trend—and we should not follow this one. "[P]ublic policy demands that responsibility be fixed wherever it will most effectively reduce the hazards to life and health inherent in defective products that reach the market." *Shoshone Coca-Cola Bottling Co. v. Dolinski*, 82 Nev. 439, 442, 420 P.2d 855, 857 (1966) (quoting *Escola v. Coca Cola Bottling Co.*, 150 P.2d 436, 440 (Cal. 1944) (Traynor, J., concurring)). The majority's conclusion fails the public by making it easier for faulty products, licensed under trusted names, to enter the marketplace. Eliminating any need for a trusted company to ensure the products bearing that company's name live up to safety standards for which that company may be known hurts consumers. Because the majority's holding steps back from the imperative of protecting consumers, I dissent.

I am unpersuaded by the rationale for the exclusion of licensors from strict liability under the Restatement (Third) of Torts. The Third Restatement excludes licensors ostensibly because the "function of the [AMD] has, as it were, been absorbed by the theory of sellers' strict liability." *Hebel v. Sherman Equip.*, 442 N.E.2d 199, 202 (Ill. 1982). Admittedly, since the beginning of the 20th century, there has been a sea change in litigation over faulty products. Warranty actions—requiring privity between consumers, sellers, and manufacturers—have been encompassed by the doctrine of strict liability. *See generally* William L. Prosser, *The Fall of the Citadel (Strict Liability to the Consumer)*, 50 Minn. L. Rev. 791 (1966) (discussing the dismantling of barriers to suing for injuries caused by faulty products).

SUPREME COURT
OF
NEVADA

(O) 1947A

But this need not be a case of closing one door simply because another door has opened. The point of strict liability is to provide "the maximum possible protection for the user of the product," not just some possible adequate remedy. *Allison v. Merck & Co., Inc.*, 110 Nev. 762, 769, 878 P.2d 948, 953 (1994) (quoting Prosser, *supra*, at 799). Essential policy reasons support holding licensors liable for faulty products: (1) incentivizing licensors to ensure products bearing their name are safe for consumers, (2) conforming to consumers' reasonable expectations of quality, and (3) ensuring a remedy for those injured by faulty products. David J. Franklyn, *The Apparent Manufacturer Doctrine, Trademark Licensors and the Third Restatement of Torts*, 49 Case W. Res. L. Rev. 671, 709-10 (1999).

First, licensors should be incentivized to ensure products bearing their name are not dangerously defective. *Id.* at 710. The majority concludes that because a licensor does not partake in manufacturing, designing, or selling a product, the licensor is unfit to ensure its products are safe. Majority Op. at 9-10 (citing *Hebel*, 442 N.E.2d at 205, and *Antone v. Greater Ariz. Auto Auction*, 155 P.3d 1074, 1080 (Ariz. Ct. App. 2007)). But products liability has always swept in a wide range of defendants, understanding that each member of the supply chain has a responsibility to control the quality of a product. Excluding licensors ignores the fact that by putting a reputable name on a product, the product is more likely to enter the stream of commerce, and likely at higher volumes. A significant factor in determining whether a party should be strictly liable for a defective good is whether the party "derive[s] economic benefit from placing [the goods] in the stream of commerce." *Hebel*, 442 N.E.2d at 205. Licensors clearly derive an economic benefit from the use of their license on products entering the marketplace.

Holding licensors liable is not unfair. Licensors are paid for their trademark and should expect to be held responsible for flaws with the licensed product. Franklyn, *supra*, at 710. The majority's logic would allow a company fed up with being sued to simply license its existing trademark in return for compensation, while experiencing no liability associated with the products bearing its name. A company should not be able to blind itself to the poor quality of goods for which it receives economic benefit and dodge all liability when products bearing the company's name injure people. Further, a licensor would be able to pursue remedies against a licensee if the licensee is at fault for failing to assure the quality of a product, leaving innocent licensors with a path to recovery, even if they are liable to the consumer.

Second, allowing licensors to avoid liability for products bearing their name undermines consumers' reasonable expectations. *Id.* at 709. Consumers often purchase products based on the reputable company's name on the product. It is reasonable for a consumer to choose one product over another based on the safe reputation of a company and the public trust that company has built into its name. Again, a licensor "derives a benefit from including its trade name on a product manufactured by another, representing to consumers that the product is of a certain origin or quality. This is precisely why the doctrine's focus is on the expectations of ordinary, reasonable consumers." *Rublee v. Carrier Corp.*, 428 P.3d 1207, 1219 (Wash. 2018) (en banc).

Not only would it be reasonable for a consumer to assume the nail gun in question was made by RIDGID; it would be unreasonable not to think so based on the packaging of the nail gun. As this photograph of the

packaging reveals, a consumer would be unable to ascertain that RIDGID only provided a license and did not manufacture the tool in question.



A consumer purchasing this item would expect to buy a RIDGID tool, relying on the guarantees of quality and safety associated with RIDGID's name. In the affidavit RIDGID presented to the federal court to support its motion for summary judgment, its long-time engineer attests that RIDGID's "brand is known throughout the professional trades for its hallmark characteristics of dependable and reliable performance." Reputation, and consumer reliance on that reputation, are the value RIDGID brings to the trademark licensing agreement. Because RIDGID received an economic benefit from consumer reliance on RIDGID's reputation when this nail gun was purchased, RIDGID should be held liable for failing to ensure that products with its name are free of defects.

Last, I am concerned that when a consumer cannot ascertain the identity of or recover from the actual manufacturer, they will be left

without any recourse at all. Franklyn, *supra*, at 710. Another overriding concern of products liability is to ensure recourse for those injured by products, even if the defendant bears a tenuous connection to the defect causing the injury. *See Zamora v. Mobil Corp.*, 704 P.2d 584, 589 (Wash. 1985) (en banc) (recognizing the justification for "extension of strict liability to all sellers . . . is provision of the 'maximum of protection' to the consumer" and holding "[t]hat policy rationale is as applicable to sellers who never handle or control the product as it is to those sellers who do"). When a company licenses its trademark and creates a byzantine web of difficult-to-track, often extra-jurisdictional, manufacturers and distributors, it may be practically impossible for an injured person to be compensated for their injuries. In that case, strict products liability will have failed its essential purpose. And placing liability on the licensor, the name a consumer will easily be able to find, is appropriate, especially when a licensor can contract for higher fees associated with any risk of increased liability.

Again, a trend is only a trend. And because following the trend of allowing licensors to escape liability for products sold as their own fails to give consumers the maximum protection they deserve, I dissent.

_____, J.
Bell

I concur:

_____, J.
Pickering